UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CLARK MOVING & STORAGE, INC. and AXA RE
PROPERTY AND CASUALTY INSURANCE
COMPANY,

               Plaintiffs,

07-CV-6420
**DECISION**
          v.                            **and ORDER**

SELECTIVE INSURANCE COMPANY OF AMERICA
and HARTFORD INSURANCE COMPANY, as
Subsidiary of The Hartford Financial
Services Group, Inc.,

               Defendants.

_____

## <u>INTRODUCTION</u>

Plaintiffs Clark Moving & Storage, Inc. ("Clark") and Axa Re Property and Casualty Insurance Company ("Axa Re"), (hereinafter collectively "Plaintiffs"), bring this action against defendant Selective Way Insurance Company ("Selective" or "Defendant"), incorrectly named as Selective Insurance Company of America, seeking a declaration that Selective is obligated to indemnify and provide insurance coverage to Clark in connection with a lawsuit and arbitration award against Clark for damages sustained to its customer's property while being held in storage in Clark's warehouse.  Axa Re seeks reimbursement for the costs it incurred

defending Clark in the action brought against Clark by the customer and for the costs incurred to pursue the instant action[1].

Clark claims that it purchased a Warehouseman's Legal Liability insurance policy ("the Relevant Policy") from Selective for the yearly period from May 1, 2000 through May 1, 2001 (hereinafter the "relevant policy period"), during which a customer's household goods and belongings were damaged while in storage at Clark's warehouse located at 3680 Buffalo Road, Rochester, New York.

Clark contends that it sought liability coverage from Selective in connection with the customer's lawsuit and the resulting arbitration proceeding pursuant to the terms of the Policies, but Selective denied coverage. Instead, Axa Re defended Clark in the lawsuit and arbitration, and now it seeks to be reimbursed for those expenditures, as well as the costs incurred to date in bringing a declaratory judgment action against Selective.

Selective denied Clark's request for indemnification and insurance coverage because, among other things, it did not deem the customer's "loss" to be a "covered loss" under the terms of the Policies. Selective claims that the type of loss at issue is

---

[1]   On March 6, 2008, a joint settlement conference was held before Magistrate Judge Jonathan Feldman in this action and the customer's action, at which Defendant Hartford Insurance Company ("Hartford") resolved its portion of the customer's loss on Clark's behalf directly with the customer. Accordingly, the only claims that remain in this declaratory judgment action are the claims Clark and Axa Re have asserted against Selective.

specifically excluded from coverage under the terms of the Policies.

Before the Court for determination is Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion"). Plaintiffs seek a declaratory judgment in their favor as a matter of law based upon interpretation of the disputed language in the relevant policy. Selective opposes Plaintiffs' Motion, contending there are several issues of material fact that require a trial in this matter.

For the reasons set forth below, I grant in-part and deny in-part the Plaintiffs' Motion for Summary Judgment. I find that to the extent the customer's goods were damaged by accidental exposure to water, such a "loss" is a "covered loss" as those terms are used and defined in the 2000/2001 warehouseman's liability policy (the "Relevant Policy"). Accordingly, Plaintiffs' Motion seeking a declaration that the Relevant Policy covers the customer's losses resulting from the warehouse roof leak is granted, and Selective was required to provide a defense to Clark against the customer's lawsuit. Therefore, Axa Re is entitled to reimbursement of the defense costs. Plaintiffs' Motion is denied in-part, however, because there is a genuine issue of material fact concerning the apportionment of damages in this case. Specifically, there are questions of fact as to how much of the damages sustained and awarded to the customer resulted from the accidental "loss," and whether some of the damage resulted from Clark's alleged

intentional conduct.   Accordingly, I deny without prejudice Plaintiffs' request for a declaration that they are entitled to indemnification in connection with the customer's lawsuit against Clark.

## BACKGROUND

In September 1999, John and Teri Petrie (collectively, the "Petries") entered into a storage contract with Clark. (Plaintiffs' App.[2], Ex. K).  Clark agreed to pack and store a large quantity of personal property and household goods for the Petries while they relocated in connection with John Petrie's transfer for Delphi Automotive ("Delphi"). (Id.).  The Petries' goods remained in storage at Clark's warehouse for four years, until September 2003.

Sometime in or around April 2001, a roof leak occurred in Clark's facility in which the Petries' property was stored located at 3680 Buffalo Road.  (Plaintiff's App., Ex. H, p. 7; Reply Affidavit of Robert G. Scumaci, Esq. ("Scumaci Reply Aff.") ¶8, Ex. A).  The location of the leak was concentrated, at least in part, over the storage room that housed the Petries' property. (Plaintiff's App., Ex. H, pp. 9-10, 15).  As a result, Plaintiffs allege that the property became wet, which in turn caused water and mold damage to the items.  (Id., pp. 9-10, 15, 16).

---

[2] "Plaintiffs' App." refers to the Plaintiffs' Appendix to Local Rule 56.1 Statement of Material Facts and the corresponding exhibits annexed thereto, all submitted in support of Plaintiffs' Motion for Summary Judgment.

Clark contends that immediately upon discovering the leak (on April 17, 2001), it repaired the roof. (Affidavit of Katherine M. Clark ("Clark Aff."), ¶8). Although Clark repaired the roof, it did not notify the Petries that a roof leak had occurred over the unit storing their property. (Plaintiffs' App., Ex. H, 11).

The Petries did not discover the damage to their property until a few years later in September 2003, when Clark shipped the property to the Petries' new home in Michigan. (Plaintiffs' App., Ex. H, pp. 19-21; Clark Aff., ¶12). The Petries testified in their action against Clark that when their goods were being unloaded from the truck, they immediately noticed a problem because the boxes were not marked or labeled as they originally had been when they were placed in storage in 1999. (Plaintiffs' App., Ex. E, pp.19-22, Ex., F, pp. 29-32).

Upon opening the boxes, the Petries discovered that their goods had water stains, or appeared discolored from water exposure, and many of the items were covered with mold. (Plaintiffs' App., Ex. E, pp. 22-24, Ex., F. pp. 32-33). That mold allegedly infested the new residence in Michigan, which required remediation. (Plaintiffs' App., Ex. A, ¶15, Ex. A at Ex. A, ¶19). The Petries allegedly had to move out of their new home for a time while the mold infestation was addressed. (Id.).

Thereafter, in early 2005, the Petries and Delphi[3] commenced an action against Clark for property damage and the costs associated with remediating the Michigan home to remove the mold (hereinafter the "Underlying Action")[4]. (Plaintiffs' App., Ex. A at Ex. A). The Petries contended that upon discovering the roof leak affecting the Petries' storage unit, Clark re-packed their belongings in dry boxes, and in doing so, mixed water-damaged items with non-damaged items, thereby spreading the mold damage to other property. (Id., ¶¶ 13, 14). Clark denied this allegation throughout the Underlying Action (as well as in the instant motion before this Court), claiming they were totally unaware that any damage had been done to the Petries' property as a result of the roof leak until 2003 when the items were unpacked at the Michigan home. (Clark Aff., ¶12).

---

[3] Delphi, through GMAC Relocation Services, agreed to pay for Clark's services and assumed responsibility to pay for certain aspects with respect to the stored property for a limited period of time. Delphi reimbursed the Petries for their damaged property and the costs associated with the remediation of the Michigan residence. John Petrie assigned his rights to Delphi to pursue a claim against Clark for the Petries' damages. (See Plaintiffs' App., Ex. A at Ex. A, ¶¶ 21,22, Ex. J).

[4] The Petries' claims for property damage fell into three categories, with a different insurance carrier responsible for each category of damage as follows: (1) damage to the household goods while in storage at Clark's warehouse between September 1999 and September 2003; (2) damage or loss of household goods while in-transit and during delivery to home in Michigan in September 2003; and (3) damage to the Petries' new home in Michigan from the mold contamination. Hartford and Axa Re were responsible for damage categories (2) and (3), respectively. Because Hartford and Selective initially disclaimed coverage, Clark and Axa Re commenced the instant action against them. In 2008, however, Axa Re and Hartford resolved its portion of the Petries' claims directly with the Petries and on behalf of Clark as the insured. Selective is the only carrier that continued to disclaim coverage.

The Underlying Action, initially commenced in the Monroe County, New York Supreme Court, was removed to the Federal Court for the Western District of New York, where it proceeded to binding arbitration pursuant to the terms of the contract between Clark and the Petries. The Arbitrator awarded the Petries $500,000 in damages, based upon the evidence before him of the value of the goods at the time the items were placed in storage with Clark (hereinafter the "Arbitration Award"). (Plaintiffs' App., Ex. D). Clark demanded that Selective pay the Arbitration Award, but Selective has not responded to this demand.

Because Selective refused to defend Clark in the Underlying Action, Clark and Axa Re commenced the instant declaratory judgment action seeking insurance coverage, indemnification and reimbursement from Selective. (Plaintiffs' App., Ex. A). Clark and Axa Re claim to have tendered the defense of the Underlying Action to Selective on a number of occasions, and further claim that Selective has had multiple opportunities to settle the Petries' claims on Clark's behalf and/or participate and defend Clark in the arbitration proceeding, but Selective refused. (Id.; Scumaci Aff., ¶¶ 13-15).

Clark and Axa Re now move for summary judgment against Selective seeking a declaratory judgment that pursuant to the terms of the Relevant Policy, Selective must indemnify Clark for the Arbitration Award and must reimburse Axa Re for all costs incurred

in defending Clark in the Underlying Action and in bringing the
instant action against Selective for coverage.

There is no dispute that Selective was timely and/or properly
notified of the Petries' loss and/or the claims against Clark, and
there is no debate that Selective issued a proper denial of
coverage. The only issue before the Court is whether Selective's
2000/2001 liability policy insures Clark in connection with the
Underlying Action and the Arbitration Award.

For the reasons set forth below, I find that the terms of the
Relevant Policy provide insurance coverage for damages to the
Petries' property that resulted from the warehouse roof leak that
occurred in April 2001, and therefore, Plaintiffs' Motion for a
declaratory judgment declaring that the Relevant Policy provides
coverage for the loss attributable to the roof leak and declaring
that Selective was required to tender a defense to Clark in the
Underlying Action is granted. However, material questions of fact
remain as to what portion, if any, Clark is responsible for the
Petries' damages. Therefore, Plaintiffs' request for a declaration
requiring Selective to indemnify Clark in connection with the total
Arbitration Award is denied without prejudice.

## **DISCUSSION**

### I. Plaintiffs' Motion for Summary Judgment

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides
that summary judgment "should be rendered if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In reaching this determination, "'the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party . . .'" Catalano v. State Farm Ins. Cas. Co., 2007 WL 295321, *3-4 (W.D.N.Y. 2007)(quoting Thomas v. Irvin, 981 F.Supp. 794, 799 (W.D.N.Y. 1997)).  A fact is "material" only if it has some effect on the outcome of the suit.  Id. at *4 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

"A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial."  Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

Clark and Axa Re move for summary judgment seeking a declaratory judgment that Selective is obligated under the Relevant Policy (the 2000/2001 Warehouseman's Liability Policy) to provide

a defense in the lawsuit brought by the Petries and pay damages or judgments associated with their claims, namely the Arbitration Award, which is well within the Relevant Policy's limit. Clark argues that the loss originated during the period covered by the Relevant Policy, that the loss was "accidental" and a "covered loss" under the Policy, and that there are no genuine issues of material fact as to the meaning and effect of the terms of the Relevant Policy. Further, even if the terms of the Policy are ambiguous, any ambiguity must be resolved against Selective as the insurer.

Selective contends that summary judgment is not warranted because, among other things, there are genuine issues of material fact as to whether the subject loss occurred during the covered period and whether the loss was an "accident" as defined in the Relevant Policy. Principally, however, Selective argues that the loss and resulting damage to the Petries' property is excluded from coverage under the terms of the Relevant Policy.

For the reasons that follow, I find that Selective is obligated under the Relevant Policy to provide Clark with a defense in the lawsuit brought by the Petries, and further, that there is insurance coverage under the Relevant Policy for any losses attributable to the warehouse roof leak. Accordingly, Plaintiffs' Motion for a declaratory judgment regarding the terms of the Relevant Policy is granted and Selective is required to reimburse

Axa Re for the costs incurred in defending Clark in the Underlying Action. Plaintiffs' Motion with respect to their request for a declaration that Selective is required to indemnify Clark and pay the entire Arbitration Award is denied because there are genuine issues of fact as to the apportionment of the Petries' damages to be borne by Clark and Selective.

II. <u>Standard of Review</u>

It is well-settled that contract interpretation is a matter of law for the court to decide, <u>Int'l Multifoods Corp. v. Commercial Union Ins. Co.</u>, 309 F.3d 76, 82 -83 (2d Cir. 2002), and an insurance policy is construed and examined as any other contract. <u>See</u> <u>Drew Chem. Corp. v. Fidelity and Cas. Co. Of NY</u>, 96 Misc.2d 503, 506 (Sup Ct NY Co 1976), <u>aff'd</u>, 60 A.D.2d 552 (1st Dep't 1977), <u>aff'd</u>, 46 N.Y.2d 851 (1979). Accordingly, "'[i]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence' and it may then award summary judgment.'" <u>Int'l Multifoods</u>, 309 F.3d at 83 (quoting <u>Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's, London</u>, 136 F.3d 82, 86 (2d Cir. 1998). With these principles in mind, I turn to the parties' disputes about the Relevant Policy at issue here.

A.  The Loss occurred During the Time Period Covered by the
    Relevant Policy

Selective initially argues that there is a genuine issue of material fact whether the roof leak occurred during the period of time covered by the Relevant Policy.  Contrary to Selective's arguments, however, all of the admissible evidence before the Court indicates a roof leak occurred over the Petries' storage unit in or around April 2001.  There is no evidence in the record indicating that the Petries' property was exposed to water at some other time - i.e., outside the period of time covered by the Relevant Policy - or as a result of some other event other than the roof leak.  Accordingly, the Court rejects the Defendant's argument that there is an issue of material fact whether the loss occurred during a covered period.

B.  Coverage for the Loss

    1.  The "Loss" was an "Accident" within the meaning of
        the Relevant Policy.

Selective disclaimed coverage in the Underlying Action on the basis that the Relevant Policy does not cover the damage to the Petries' property because the "loss" was not accidental as the term is defined in the Relevant Policy.

Under the Relevant Policy, a "loss" is defined as "accidental loss or damage."  Section A of the Policy provides:

> We will pay for a 'loss' to Covered Property
> from any of the Covered Causes of Loss.

(See Plaintiffs' App., Ex. C, §(A); §F(1)).  Section A(3) defines

"Covered Causes of Loss" as follows:

> Covered Causes of Loss means your legal
> liability as a warehouseman or bailee for
> DIRECT PHYSICAL 'LOSS' to Covered Property[5]
> except those causes of 'loss' listed in the
> Exclusions.

(See Plaintiff's App., Ex. C, (A)(3) (emphasis in original)).

Plaintiffs argue there is no question of fact that the "loss"

sustained in this case was accidental.  Moreover, Plaintiffs

contend that the loss was a "direct physical loss" to covered

property for which Clark was clearly liable.  Selective contends

that, assuming the Petries' claims are true, and Clark re-packed

all of their belongings after the roof leak was discovered, the

loss was caused by Clark's intentional and/or reckless conduct of

mixing water-damaged goods with non-damaged goods.  According to

Selective, such conduct would not be covered under the terms of the

Relevant Policy or under New York common law.

"It is well established under New York law that a policyholder

bears the burden of showing that the insurance contract covers the

loss."  Morgan Stanley Group, Inc. v. New England Ins. Co., 225

F.3d 270, 276 (2d Cir.2000); see also, Consolidated Edison of N.

---

[5] There is no genuine issue of fact that the Petries' goods were
"Covered Property" under the terms of the Relevant Policy. (Plaintiffs' App.,
Ex. C (A)(1)(a)).  Selective suggests that there are a few items of jewelry
and artwork that would be excluded from coverage under the terms of the
Policy.  Plaintiffs' assert that the total value of those few items is less
than $4,500 of the $500,000 Arbitration Award.  As discussed below, any amount
of damages for which Selective is required to indemnify Clark can be addressed
via discovery or trial.

Y., Inc. v. Allstate Ins. Co., 98 N.Y.2d 208, 218 (2002) ("Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage"); Topor v. Erie Ins. Co., 28 A.D.3d 1199, 1200 (4th Dep't 2006) ("An insured seeking to recover for a loss under an insurance policy has the burden of proving that . . . the loss was a covered event within the terms of the policy.").

In the instant case, the Policy provides insurance coverage for "accidental" and "direct physical loss" to property stored in Clark's warehouse. (Plaintiffs' App., Ex. C, §(A)(1)(a) and (A)(3)). To fall within this definition, Plaintiffs must demonstrate that the Petries' loss was accidental, fortuitous, and/or beyond Clark's control. See Catalano v. State Farm Ins. Cas. Co., 2007 WL 295321, *4 (W.D.N.Y. 2007); 40 Gardenville, LLC v. Travelers Property Cas. of America, 387 F.Supp.2d 205, 210-214 (W.D.N.Y. 2005).

In establishing a "fortuitous loss," the insured must show that the damage sustained to the insured property was caused by a "fortuitous" event within the meaning of the policy. See Id.; see also, 525 Fulton St. Holding Corp. v. Mission Nat'l Ins. Co., 256 A.D.2d 243, 248 (1st Dep't 1998) ("[T]he burden is on plaintiff to prove that the water damage it sustained was caused by a 'fortuitous' event within the meaning of the policy . . ."). The word "fortuitous" has been construed to mean an event "happening by

chance or accident." See Catalano, 2007 WL 295321, *4 (quoting, 40 Gardenville, 387 F.Supp.2d at 211). Thus, the requirement of a fortuitous loss is a necessary element of insurance policies based on either an "accident" or "occurrence." See 40 Gardenville, 387 F.Supp.2d at 211; accord, Int'l Multifoods, 309 F.3d at 83.

As applied, the fortuity doctrine prevents insurers from having to pay for losses arising from undisclosed events that existed prior to coverage, as well as events caused by the manifestation during the policy period of inherent defects in the insured property that existed prior to coverage. See 40 Gardenville, LLC, 387 F.Supp.2d at 211-212 (citing 80 Broad Street Co. v. United States Fire Ins. Co., 80 Misc.2d 706 (Sup Ct Queens Co 1975)). "Both federal and state courts in New York recognize the value of preventing recovery for such losses:

> The policy rationale for the fortuity doctrine is simple. When parties enter into an insurance contract, they are, in effect, making a wager as to the likelihood that a specified loss will occur. If the loss has already occurred, or the insured knows that the loss is certain to occur for reasons not disclosed to the insurer, then the insurance contract is not a fair bet."

40 Gardenville, at 211 (quoting CPH Intern., Inc. v. Phoenix Assur. Co. of New York, 1994 WL 259810, *6 (S.D.N.Y. 1994); Chase Manhattan Bank v. New Hampshire Ins. Co., 193 Misc.2d 580, 593 (Sup Ct NY Co 2002)).

Similarly, whether a loss is accidental or intentional as those terms are commonly used in insurance policies must be evaluated from the perspective of the insured. See Agoado Realty Corp. v. United Intern. Ins. Co., 95 N.Y.2d 141, 145 (2000) (citing Miller v. Continental Ins. Co., 40 N.Y.2d 675, 676 (1976)). It must be determined whether the loss was unexpected, unusual and unforeseen. Id. Although there is no "all inclusive definition" of the word "accident," "[a]n excellent definition . . . is 'an event of an unfortunate character that takes place without one's foresight or expectation, an undesigned sudden event, a mishap, a mischance, a calamity of catastrophe, a happening not in the usual course; fortuitously, unforeseen and without cause.'" Drew Chemical Corp., 96 Misc.2d at 505 (quoting Matter of Croshier v. Levitt, 5 N.Y.2d 259, 269 (1959)).

The evidence before the Court establishes that the principal cause of the loss in this case was a roof leak which and a fortuitous event resulting in water damage and mold contamination to the Petries' stored goods. Indeed, a roof leak over the stored goods is by definition, an unfortunate, undesigned, mishap, which I find resulted in a "direct physical loss" and falls squarely within the terms of the Relevant Policy. See c.f., Siegel v. Chubb Corp., 33 A.D.3d 565, 566 (1st Dep't 2006) (granting summary judgment to the insurer where there was "no evidence that the mold

was caused by any leak, which plaintiffs argue would be a covered occurrence.")

Viewing the evidence in the record differently would frustrate the ordinary and plain meaning of the words employed in the Relevant Policy and defeat the purpose of purchasing warehouseman's liability insurance. See In re Prudential Lines, 158 F.3d 65, 77 (2d Cir. 1998). Indeed, "in construing a policy, the guide of the courts must be the reasonable expectation and purpose of ordinary business men when making such a contract . . ." Drew Chemical Corp., 96 Misc.2d at 506 (internal citations omitted).

The evidence in the record clearly establishes that the principal cause of the Petries' losses originated from an accidental roof leak. Accordingly, Plaintiffs' Motion seeking a declaration that the Relevant Policy covers losses resulting from the warehouse roof leak is granted, and the Court declares that any damages resulting from the 2001 roof leak are "covered loss[es]" within the meaning of the Policy. As a result, Selective was required to provide a defense to Clark in the Underlying Action, and its failure to do so entitles Axa Re to reimbursement for the costs it expended defending Clark in the lawsuit brought by the Petries. Material questions remain, however, regarding how much of the Petries' "loss" was caused by Clark's alleged intentional conduct in re-packing the Petries' goods. Put differently, there is a material question of fact whether or not Clark is responsible

for any portion of the Arbitration Award, which would be determinative of the extent of indemnification owed by Selective under the terms of the Relevant Policy.

When drawing reasonable inferences against Clark, as the Court must do on this motion for summary judgment, the objective evidence suggests that Clark re-packed the Petries' belongings and may have mixed water damaged property with non-damaged property thereby spreading the mold damage among the Petries' goods. (Plaintiffs' App., Ex. A at Ex. A; Ex. E, pp. 19-22, Ex., F, pp. 29-32). There is no means to determine on this record whether Clark's alleged conduct caused additional damage to the Petries' property than would have otherwise been sustained from the accidental roof leak alone. As a result, the objective evidence in the record raises a material question as to whether Clark's alleged intentional conduct requires it to be directly responsible to the Petries for a portion of their damages (i.e., a portion of the Arbitration Award).

> 2. Losses caused by Water Damage are not Excluded from Coverage under the Terms of the Policy.

Selective argues that the loss to the Petries' property was caused by "dampness, gradual deterioration, and/or wear and tear," which is excluded from coverage under the terms of the Policy. Selective relies on Judge Skretny's decision in 40 Gardenville, LLC v. Travelers Property Cas. of America, 387 F.Supp.2d 205 (W.D.N.Y. 2005), as authority that the word "dampness," as it is commonly used in insurance policies, has been held to exclude insurance

coverage for damage that results when property is exposed to water.

Plaintiffs argue that the Policy does not specifically use the word "water," and if Selective intended to exclude coverage for damages that result from direct exposure to water, it was obligated to incorporate "water" in the written policy. Instead, Plaintiffs contend, Selective used the word "dampness," which when read in the context of the entire paragraph, was intended to exclude damage that results from inherent moisture or dampness in an item when packed and/or stored. According to Plaintiffs, the word "dampness" should not be construed to exclude coverage, when as here, items are exposed to an outside source of water after the items have been packed and placed in storage.

The insurer bears the burden of demonstrating that coverage under the subject insurance policy is excluded. See 40 Gardenville, 387 F.Supp.2d at 213 (citing Kimmins Indus. Service Corp. v. Reliance Ins. Co., 1993 WL 667308, at *3 (W.D.N.Y. 1993)). "[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language." Id. (quoting 213 Simplexdiam, Inc. v. Brockbank, 283 A.D.2d 34, 38 (1st Dep't 2001). Moreover, if a coverage exclusion is intended that is not apparent from the language of the policy, it is the insurer's responsibility to make its intention clearly known. Agoado Realty Corp. v. United Intern. Ins. Co., 95 N.Y.2d at 145. In this case, Selective failed to demonstrate that the

Relevant Policy intended to exclude losses, including mold damage, that result from accidental exposure to water. Accordingly, the Relevant Policy provides insurance coverage for any damage to the Petries' property that resulted from accidental exposure to water.

In determining whether a particular exclusion contained in an insurance policy applies, courts must focus on the proximate cause of the claimed loss. 40 Gardenville, at 213 (citing Kimmins, *supra*). In the instant case, the Selective Policy provides, in pertinent part, as follows:

> 3. We will not pay for a 'loss' caused by or resulting from any of the following. But if 'loss' by a Covered Cause of Loss results, we will pay for that resulting 'loss.' ...
>
> (d) Wear and tear, any quality <u>in the property itself</u>, hidden or latent defect, gradual deterioration, mechanical breakdown, insects, vermin, rodents, corrosion, rust, dampness, cold or heat.

(Plaintiffs' App., Ex. C, §(B)(3) (emphasis added)).

When reviewing this language in light of the proximate cause of the loss at issue in this case, the Court concludes that the term "dampness" is not akin to "wetness" or "moistness" or "water," as Defendant urges[6].

_____

[6] Selective also contends that, to the extent Plaintiffs are seeking insurance coverage for the Petries' claims for chips, gouges and scratches to the property while in storage or during transport to the new home in Michigan, such losses are also excluded from coverage under the Policy (Section (B)(3)(d) as "wear and tear" or "gradual deterioration"). An entirely different insurance policy was in effect during the period of time the goods were shipped to Michigan in 2003, and Selective properly disclaimed coverage for any claims during that time period. Plaintiffs state that any category of damage associated with the transport of the Petries' goods to Michigan, including the remediation of the mold infestation of the new home, was the

Significantly, in this case, and unlike in <u>40 Gardenville</u>, there was no condition that pre-dated the Policy, which Clark knew of, that proximately caused the loss and resulting mold damage.

In <u>40 Gardenville</u>, it was undisputed that the building at issue had been vacant for significant periods of time. Prior to the inception of the policy, substantial amounts of water had infiltrated the building through the leaking roof, saturated the carpets, and pooled into puddles on the floor of the building. <u>Id</u>. at 213. The plaintiffs in that case (the owners of the building) were well aware of the building's problems from exposure to water prior to purchase (and prior to obtaining insurance on the building). <u>Id</u>. at 212.

Moreover, the Court's decision in <u>40 Gardenville</u> implies that the plaintiffs withheld a pre-purchase inspection report they had commissioned because the report likely indicated that the leaks in the roof, the wet carpeting and the water that had collected into puddles on the floor could lead to (if it hadn't already) the development of mold. <u>See id</u>. at 214. Accordingly, Judge Skretny's interpretation of the word "dampness" is unquestionably tied with his determination that "the water or dampness present in the building was the proximate cause of the mold contamination" and that the damp and wet condition of the building was well known to

_____

responsibility of different insurance carriers, and those claims have already been resolved directly with the Petries. The instant motion concerns only coverage for the original loss during the 2000/2001 Policy period and consequential damages flowing from that loss (i.e, mold damage to the goods).

the plaintiffs and pre-dated the issuance of the insurance policy and the purchase of the building.  Id.

Here, the "Exclusions" section of the Policy is not ambiguous, as it plainly does not use the word "water."  Even if the exclusionary language could be considered ambiguous, in the absence of any proof from Selective regarding the intended meaning of the exclusions, any ambiguity must be resolved against the insurer. See Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006); Pepsico, Inc. v. Winterthur Intern. American Ins. Co., 13 A.D.3d 599, 600 (2d Dep't 2004).  Selective has only offered Judge Skretny's holding in 40 Gardenville to satisfy its burden of demonstrating that the word "dampness" was intended to exclude insurance coverage for losses resulting from exposure to water while in storage at Clark's warehouse.  This is insufficient to defeat summary judgment and/or raise a genuine issue of material fact as to whether coverage is excluded under the terms of the Relevant Policy for the accidental exposure of stored goods to water.  Therefore, Plaintiffs' Motion seeking a declaration that the Relevant Policy does not exclude coverage for damages sustained to stored property as a result of being accidentally exposed to water is granted.

III.  <u>Remaining Claims</u>

I find Selective's remaining contentions, that the Petries' property cannot be considered "Covered Property" under the Relevant

Policy and that the Selective Policy was intended to be excess insurance coverage to the Axa Re policy, are without merit.

As set forth above (see footnote 5, *infra*), there is no material question of fact that the Petries' household goods and belongings that were stored in Clark's warehouse constituted "Covered Property" under the terms of the Policy. (See Plaintiffs' App., Ex. C, §(A)(1)(a) ("Covered Property, [] means lawful goods and merchandise, the property of others, that [Clark has] accepted for storage [] under a [] storage contract as a warehouseman or bailee. Such property is covered: (a) While at your premises . . ."). To the extent the $500,000 Arbitration Award included damages for uncovered goods, such as jewelry and artwork, the value of those items can be properly deducted from Selective's indemnification obligation.

Further, there is no evidence that an Axa Re policy was in effect and/or provided insurance coverage during the time period at issue in this case (i.e., the 2000/2001 yearly period).

## CONCLUSION

For the reasons set forth above, I hereby grant Plaintiffs' Motion for Summary Judgment in-part and declare that the Relevant Policy provides insurance coverage for losses caused to the Petries' property as a result of the accidental exposure of their property to water. Moreover, Selective was required to defend Clark in the Underlying Action, and therefore, Plaintiffs' Motion

seeking reimbursement for the defense costs incurred in the Underlying Action is also granted, including reasonable attorneys' fees and disbursements.   Plaintiffs' Motion seeking an order requiring Selective to indemnify Clark for the total Arbitration Award must be denied without prejudice because there are material issues of fact whether all of the damage to the property resulted from the accidental roof leak, or whether a portion of the damage was caused by Clark's alleged intentional conduct.


        ALL OF THE ABOVE IS SO ORDERED

                              S/Michael A. Telesca
                    _____
                         MICHAEL A. TELESCA
                    United States District Judge


Dated:     Rochester, New York
           August 27, 2010